

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 12, 2020**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SENIOR CARE CENTERS, LLC, *et al.* | § | Case No. 18-33967 (SGJ) |
| | § | |
| Debtors. | § | |
| | § | |
| | § | |
| TXMS REAL ESTATE | § | |
| INVESTMENTS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Pro. No. 20-03073 (SGJ) |
| | § | |
| SENIOR CARE CENTERS, LLC | § | |
| ABRI HEALTH SERVICES, LLC AND | § | |
| ALAN HALPERIN, TRUSTEE, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER: (1) DENYING (SINCE WITHDRAWN) DEFENDANTS' MOTION TO DISMISS [ECF NO. 7]; AND
## 2) DENYING PLAINTIFF TXMS REAL ESTATE INVESTMENTS, INC.'S
## <u>MOTION TO REMAND AND ABSTAIN [ECF NO. 8]</u>

Stacey G. C. Jernigan, United States Bankruptcy Judge

## I.    Introduction.

This is not the first dispute that this bankruptcy court has been called upon to resolve among these parties. Nor, the court anticipates, will it be the last. The primary parties are: (a) a lessor (plaintiff) of several real properties that are used as nursing homes, and (b) a lessee (defendant) who is an operator of the nursing homes and recently exited Chapter 11 with a confirmed plan. In fairness, the lessor, TXMS Real Estate Investments, Inc. ("TXMS"), would prefer that this court not adjudicate this dispute. Instead, it believes that this removed action must be heard in Texas state district court, the court in which TXMS brought suit against Senior Care Centers, LLC (the lessee, "SCC" or the "Reorganized Debtor") and Abri Health Services, LLC, the new holding company for the Reorganized Debtor ("Abri"). The defendants—SCC and Abri—as well as an intervenor Alan Halperin, Trustee (the "Plan Trustee") of the Senior Care Liquidating Trust (the "Liquidating Plan Trust"), on the other hand, believe that the bankruptcy court can and should adjudicate this action.

For now, the court must determine: (1) whether it has bankruptcy subject-matter jurisdiction over this post-confirmation removed action (the "Adversary Proceeding"); and (2) if the court does, in fact, have bankruptcy subject-matter jurisdiction, whether it must/should abstain and remand the Adversary Proceeding to the Texas state district court where TXMS initiated the litigation. For the reasons set forth below, the court believes that it has bankruptcy subject-matter jurisdiction over this Adversary Proceeding and that abstention and remand are neither required nor appropriate under the facts of this case.

## II.    **Background Facts.**

TXMS's and SCC's business relationship dates back to at least October 2010, when TXMS and SCC entered into a Master Lease Agreement.[1] This Master Lease Agreement has been amended and restated on several occasions.[2] The Master Lease Agreement that was in effect when SCC and more than 100 of its subsidiaries (collectively, the "Debtors") filed for bankruptcy protection in this court, was the Second Amended and Restated Master Lease Agreement dated August 27, 2013 (as amended on July 11, 2014, and November 12, 2015, the "Second Amended Master Lease").[3] Pursuant to the Second Amended Master Lease, SCC leased and operated 11 properties as a single unit with a single monthly minimum rent obligation.[4]

On December 4, 2018, the Debtors sought Chapter 11 bankruptcy protection. The Debtors' spiral into bankruptcy was precipitated by several factors, including: declining reimbursement rates, difficulties in collecting accounts receivable, declining census and occupancy rates, increasing lease obligations, tightening terms with various trade creditors, and a significantly reduced working capital loan facility.[5]

TXMS was active in the bankruptcy case from its inception, yet the primary dispute between TXMS and SCC concerned whether SCC should be permitted to assume the Second Amended Master Lease, pursuant to Bankruptcy Code section 365. The dispute was brought to a head when this court ordered that an evidentiary hearing would take place on the Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Unexpired Real

---

[1] *In re Senior Care Centers, LLC*, 607 B.R. 580, 585 (Bankr. N.D. Tex. 2019).

[2] Pl.'s Original Pet., p. 4.

[3] *Senior Care Centers*, 607 B.R. at 585.

[4] *Id*.

[5] *Id*. at 586.

Property Leases, and (II) Establishing and Authorizing the Debtors to Pay Attendant Cure Amounts (the "Motion to Assume")[6] unless TXMS and several other landlords[7] consented to deferring the Motion to Assume to confirmation.

TXMS did not consent to the deferral, and the court heard a full day of evidence at a hearing on September 6, 2019. The parties engaged in extensive oral argument, several witnesses testified, and the court admitted numerous exhibits. After considering the pre- and post-trial briefing, evidence, testimony, and arguments of counsel, on October 4, 2019, the court issued its Memorandum Opinion and Order granting the Motion to Assume (the "Assumption Order").[8] Under the terms of the Assumption Order, SCC was allowed to assume the Second Amended Master Lease, effective as of the date of the Assumption Order, and was required to cure certain defaults by the earlier of the effective date of a confirmed bankruptcy plan or December 16, 2019.[9]

About three weeks later, SCC filed its Notice of Filing of Solicitation Version of Disclosure Statement for the Third Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Solicitation Notice").[10] Attached to the Solicitation Notice as Exhibit A, was the solicitation version of the Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").[11] The Plan was jointly proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Committee"). Under the terms of the Plan, the Debtors

---

[6] Case No. 18-33967, ECF No. 1479.

[7] SCC also sought to assume the various leases of other lessors including Annaly Healthcare Inv. LLC/CHI Javelin, HC Hill Country Associates, Ltd., H-C Associates, Ltd., J-S Fredericksburg Realty, LP, HC-RW Associates, Ltd., and Hidalgo Healthcare Realty, LLC. Those landlords are not parties in this Adversary Proceeding, and discussions of their participation regarding the Motion to Assume will be excluded in order to avoid any potential confusion.

[8] Case No. 18-33967, ECF Nos. 1981 and 1983.

[9] *Senior Care Centers*, 607 B.R. at 598.

[10] Pl.'s Original Pet., p. 5-6; Def.'s Mot. to Dismiss, p. 3.

[11] Case No. 18-33967, ECF No. 2094.

would reorganize around just 22 facilities (having determined to reject the leases on the majority of their facilities). The Reorganized Debtor would be a significantly slimmed down enterprise. As part of its reorganization, SCC would cancel its old equity interests and issue new common stock. On the Effective Date of the Plan, 80% of the new common stock of SCC would be distributed to the Liquidating Plan Trust, by and through the newly created entity called Abri, ***for the benefit of the Debtors' unsecured creditors***, with the remaining 20% to be reserved for distribution as part of a management incentive plan for the Reorganized Debtor's management team.[12] In total, three bundles of consideration would be transferred into a trust for the general unsecured creditors of the Debtors to share in pro rata: (a) 80% of the equity in the Reorganized Debtor; (b) a $10 million note; and (c) various causes of action of the Debtors.

On November 19, 2019, the Debtors and the Committee filed the Notice of Filing of Plan Supplement.[13] Exhibit J to the Plan Supplement was the Form Unsecured Creditor Trust Agreement (the "Trust Agreement"), which provided, among other things, that the Liquidating Plan Trust "is established for the sole purpose of the administration and ***orderly liquidation*** of the Unsecured Creditor Trust Assets for the sole benefit of the Unsecured Creditor Trust Beneficiaries . . . with no objective or authority to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Unsecured Creditor Trust's purpose[.]"[14] In the Trust Agreement, the Plan Trustee, Debtors, and the beneficiaries of the Liquidating Plan Trust agreed that value of the Liquidating Plan Trust's assets as of the Effective Date of the Plan would be zero dollars.[15]

---

[12] *Id*. at Ex. A, p. 26 (Art. III., § A(10)), 37 (Art. VI, § H), and 40 (Art. VI, § M(2)).

[13] Case No. 18-33967, ECF No. 2219.

[14] Case No. 18-33967, ECF No. 2219, Ex. J at 1. (Emphasis added).

[15] *Id*. at 8.

On November 29, 2019, TXMS filed its Objection to the Plan.[16] One of its concerns in the Objection was that, if SCC was going to be a wholly owned subsidiary of the new entity Abri, then Abri should also be a party to the Second Amended Master Lease between TXMS and SCC. TXMS did not, however, raise an issue with how the Plan's contemplated "change of control" of SCC— whereby (a) SCC would be 100% owned by a newly formed entity, Abri (which was not publicly traded and presumably had little to no net worth); and (b) the new entity, Abri, would, in turn, be owned by a liquidating creditors trust (whose beneficiaries were potentially hundreds of creditors)—would impact the Second Amended Master Lease. To be clear, the Second Amended Master Lease apparently has provisions to the effect that "any Change of Control could cause the basis for entering into the Lease to be no longer true and correct" and could give rise to an argument of default.[17] In any event, TXMS's focus at confirmation seemed to be on wanting to hold Abri accountable if SCC should default on its lease obligations. TXMS's failure to raise the issue of a change of control of the Debtors as somehow being problematic (at confirmation or at the section 365 assumption hearing, for that matter) is now, in hindsight, somewhat puzzling.

The Debtors were able to resolve most of the objections to the Plan prior to the confirmation hearing, with the court denying the remaining objections after a two-day confirmation hearing. On December 13, 2019, this court entered its Findings of Fact, Conclusions of Law, and Order Confirming Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Confirmation Order").[18] The Confirmation Order included six pages of modifications to the Plan to resolve the aforementioned objections, including that of TXMS. Specifically, the Debtors and TXMS agreed to the following language:

---

[16] Case No. 18-33967, ECF No. 2281.

[17] ECF No. 8, p. 34.

[18] Case No. 18-33967, ECF No. 2376.

> Abri Health Services, LLC shall be a full co-obligor and co-lessee, on a joint and several basis, under [the Master Lease], in all respects subject to all lessee restrictions and will execute the Master Lease or an amendment thereto on the Effective Date at TXMS's election. . . . Nothing in the Plan, Disclosure Statement, Plan Supplement, Confirmation Order, or other Plan Documents adversely modifies, impairs, impedes, or otherwise impacts TXMS's rights and remedies or the Debtors' and/or Reorganized Debtors' obligations under the assumed Master Lease and the Assumption Order. . . .[19]

On March 26, 2020, at a status conference the day before the Plan went effective, the Committee advised the court that it was in active discussions to sell the common stock that its constituency was due to receive under the Plan, that the proposed buyer was ready to close within a few days, and that it anticipated filing a motion for the court's consideration either that day or the following day.[20] According to the Confirmed Telephonic Appearance Schedule, Jason Rudd appeared at that hearing as counsel for TXMS.[21] The following day, TXMS, SCC, and Abri entered into the Third Amendment to Second Amended and Restated Master Lease Agreement (the "Master Lease.")[22] Pursuant to the Master Lease, Abri was added as a lessee.[23]

At some point after the Committee's revelation that there might soon be a sale of the equity of Abri, TXMS spoke with SCC and Abri, to confirm whether the Liquidating Plan Trust intended to sell the equity (note that by this point in time, the Plan had gone effective, the Committee was dissolved, and the Liquidating Plan Trust was in place). TXMS had apparently determined that the Plan Trustee's sale of the equity would contravene a change of control provision in the Master Lease and this would be problematic and even constitute an event of default. Thus, on April 6, 2020, TXMS sent SCC and Abri a letter indicating that any sale by the Plan Trustee that did not

---

[19] *Id.* at 50.

[20] Case No. 18-33967, ECF No. 2664, p. 27-28.

[21] Case No. 18-33967, ECF No. 2656.

[22] Pl.'s Original Pet., p. 7.

[23] *Id.*

comply with the change of control provision in the Master Lease would constitute an "Event of Default." TXMS advised SCC and Abri that if it did not receive written assurance by April 10, 2020, that they would comply with the change of control provision, TXMS would initiate a lawsuit in a court of competent jurisdiction asserting:

> a claim for declaratory judgment requesting the declaration of [TXMS's] rights, title, and/or interests in, to, and under Section 16.1(q) of the Master Lease, as well as seeking an injunction (a) enjoining any transactions in violation of Section 16.1(q) of the Master Lease, and/or (b) requiring [TXMS and Abri] to transition operations and/or management of the Leased Property to [TXMS] or its designee(s) . . . in the event that [TXMS] exercises its right to terminate the Master Lease.[24]

Abri and SCC did not respond by the Friday deadline that TXMS had self-imposed and, thus, on April 13, 2020, TXMS filed its Original Petition in the Texas state district court, initiating the above-referenced action.

In the Original Petition, TXMS sought a judgment declaring TXMS's rights, title, and/or interests in, to, and under Section 16.1(q) of the Master Lease upon any Change of Control. It also sought a temporary restraining order, temporary injunction and, permanent injunction restraining Abri and SCC from: directly or indirectly engaging in any Change of Control transaction in violation of Section 16.1(q) of the Master Lease, or making distributions or any other payments to equity holders of either defendant from the proceeds of any change of control transaction, or in the alternative, a temporary restraining order, temporary injunction, and permanent injunction requiring SCC and Abri (and their sublessees and any management companies of sublessees) to transition operations and/or management of the leased properties that are the subject of the Master Lease to Plaintiff's designee(s) in accordance with Article XVIII of the Master Lease. Lastly,

---

[24] Pl.'s Mot. to Remand, Ex. C, p. 2.

TXMS requested a judgment awarding it costs, expenses, and attorneys' fees incurred in pursuing the litigation.

SCC and Abri were served with the Original Petition on April 21, 2020, and thereafter removed the action to the bankruptcy court on May 15, 2020. On May 21, 2020, SCC and Abri filed their Motion to Dismiss and Brief in Support,[25] contending that TXMS's claims were not ripe for adjudication (in that no sale of the equity was firmly in the works). TXMS filed its Motion to Remand and Abstain and Brief in Support (the "Motion to Remand")[26] five days later, arguing that the bankruptcy court lacked jurisdiction over this dispute or, alternatively, that this court must or should abstain from hearing this matter and remand it to the Texas state district court. TXMS also filed a response to the Motion to Dismiss, disputing SCC and Abri's contention that TXMS's claims were not yet ripe.[27]

On July 28, 2020, the court held a hearing on both motions. At the conclusion of the hearing, the court requested post-trial briefing on: (1) whether the bankruptcy court may/must dismiss this matter if it determined that it is not yet ripe or whether the bankruptcy court would be required to remand it to the Texas state district court for dismissal for a lack of ripeness; (2) the possible applicability of the well-pleaded complaint doctrine on the question of the propriety of removal/remand here; (3) what effect, if any, the filing of a declaratory judgment action by one of the defendants might have on this court's subject-matter jurisdiction; and 4) whether a future sale of the equity of Abri by the Liquidating Plan Trustee would require bankruptcy court approval. On August 18, 2020, prior to the post-trial briefing submission deadline, the Plan Trustee moved to intervene in this Adversary Proceeding and requested permission to submit his own post-trial

---

[25] ECF No. 7.

[26] ECF No. 8.

[27] ECF No. 13.

briefing.[28] On September 4, 2020, the court granted the motion to intervene over the opposition of TXMS.[29]

After the Plan Trustee's intervention, SCC, Abri, and the Plan Trustee agreed with TXMS that this Adversary Proceeding is now ripe for adjudication. The court concludes, for the reasons stated in that briefing, that this matter is indeed ripe. Thus, the Motion to Dismiss is denied.

After careful deliberation, the court will also deny the Motion to Remand.

## III.    Legal Analysis.

## A.    The Court's Subject Matter Jurisdiction Over This Matter

The threshold question for this court to decide is whether it has bankruptcy subject-matter jurisdiction over this post-confirmation dispute. As this court explained in *In re Brooks Mays Music Co.*, a district court (and, by referral, a bankruptcy court) has original, but not exclusive jurisdiction over "civil proceedings that are 'arising under' the Bankruptcy Code, or 'arising in' bankruptcy cases, or are 'related to' bankruptcy cases."[30] Removal, pursuant to 28 U.S.C. § 1452(a), is proper if the bankruptcy court would have subject-matter jurisdiction over the claims asserted in the action pursuant to 28 U.S.C. § 1334(b).[31] The Fifth Circuit has acknowledged that Section 1334 does not expressly limit a bankruptcy court's post-confirmation jurisdiction.[32] Despite no Congressional limitation on a bankruptcy court's post-confirmation jurisdiction, the Fifth Circuit has opined that bankruptcy subject-matter jurisdiction does not last forever and has

---

[28] ECF No. 25.

[29] ECF No. 38.

[30] 363 B.R. 801, 807 (Bankr. N.D. Tex. 2007).

[31] *Id.*

[32] *U.S. Brass Corporation v. Travelers Insurance Group, Inc. (In re U.S. Brass Corporation)*, 301 F.3d 296, 304 (5th Cir. 2002).

generally narrowed its post-confirmation jurisdiction to matters that bear on the interpretation, implementation, or execution of the plan.[33]

Several years later, the United States Supreme Court weighed in regarding post-confirmation bankruptcy subject-matter jurisdiction in *Travelers Casualty & Surety Co. of America v. Bailey*.[34] In that case, the Court made clear that, while post-confirmation subject-matter jurisdiction does not last forever, it can endure for quite a long time. In *Travelers*, the Court explained that even decades after a plan is confirmed, the question of whether a bankruptcy court has subject-matter jurisdiction to interpret its prior orders is "easy"; a bankruptcy court plainly has jurisdiction to interpret and enforce its own prior orders.[35] The Supreme Court added, more or less, that an explicit retention of jurisdiction provision was icing on the cake.[36] Since *Travelers* was decided, the Fifth Circuit has cited to it on several occasions, explaining that "[s]ubject matter jurisdiction remains in the bankruptcy court, even after the bankruptcy case is closed, to assure that the rights afforded to a debtor by the Bankruptcy Code are fully vindicated."[37]

In this case, the court explicitly retained "exclusive jurisdiction over all matters arising out of, and related to the Chapter 11 Cases, including the matters set forth in Article X of the Plan and Bankruptcy Code section 1142."[38] Article X of the Plan pertains to the court's retention of exclusive jurisdiction over certain matters, such as: (i) all matters relating to the assumption of unexpired leases; (ii) ensuring that distributions to holders of claims are accomplished pursuant to

---

[33] *Craig's Stores of Texas, Inc. v. Bank of Louisiana (In re Craig's Stores of Texas, Inc.)*, 266 F.3d 388, 390-91 (5th Cir. 2001).

[34] 557 U.S. 137 (2009).

[35] *Id*. at 151.

[36] *Id*.

[37] *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (internal citations and quotations omitted).

[38] Case No. 18-33967, ECF No. 2376, p. 18.

the provisions of the Plan; (iii) adjudicating any disputes arising from, or relating to, distributions under the Plan; (iv) remedying any defect or omission or reconciling any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof; and (v) hearing and determining disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument, or other document governing or relating to any of the foregoing.[39] Thus, whether this court retained jurisdiction to interpret the Assumption Order, Confirmation Order, Plan, and Plan-related documents is not subject to dispute. In other words, the icing on the cake exists here. What is in dispute is whether bankruptcy subject-matter jurisdiction (*i.e.,* the cake itself) exists—which turns on whether resolution of this Adversary Proceeding bears on the implementation or execution of the Plan or requires the court to interpret and enforce these (and potentially other) prior orders.

The court concludes that bankruptcy court subject-matter jurisdiction exists in this Adversary Proceeding, even under the narrowest test. In fact, the court believes that an analysis of whether this court has jurisdiction over this matter can begin and end with the Fifth Circuit's decision in *U.S. Brass*.[40] In that case, U.S. Brass Corporation filed for bankruptcy protection after being overwhelmed with product defect lawsuits. Its suppliers, Shell Oil Company and CNA Holdings, Inc., were also sued. Shell and CNA filed a joint claim of more than $1 billion against U.S. Brass. Resolving this claim was U.S. Brass's primary objective in the plan drafting process, and U.S. Brass intended to rely heavily on insurance proceeds to satisfy that claim. The insurers

---

[39] Case No. 18-33967, ECF No. 2053, p. 52-54. This is only a partial list of matters in which the court retained jurisdiction.

[40] 301 F.3d at 296.

were active in the bankruptcy case, objecting to U.S. Brass's plan out of concern that the proposed plan would prevent them from asserting contractual coverage defenses. The insurers eventually withdrew their objections to confirmation, but only after the plan was amended to preserve their coverage defenses for later adjudication in ongoing coverage litigation.

After the plan went effective and in accordance therewith, Shell and CNA instituted litigation against U.S. Brass and another insured entity. This ultimately resulted in these parties filing a motion in aid of plan consummation and for approval of settlement with the bankruptcy court. After the bankruptcy court and district court denied this motion, it was appealed to the Fifth Circuit. Relevant to this Adversary Proceeding, the court determined that the bankruptcy court had subject-matter jurisdiction since: (1) while the plan had been substantially consummated, it had not been fully consummated; (2) there was a dispute over whether the relief requested was consistent with the plan or an improper modification of a substantially consummated plan and bankruptcy law would ultimately determine the dispute; (3) the outcome of the dispute could affect the parties' post-confirmation rights and responsibilities; and (4) the proceeding would impact compliance with, or completion of, the plan.[41]

Like in *U.S. Brass*, the Plan here has been substantially consummated, but it has not been fully consummated. In this case, the general unsecured creditors in SCC's bankruptcy case have not yet received distributions on their claims. The Liquidating Plan Trust was created to liquidate assets that could not be readily converted into cash, such as the common stock in a reorganized debtor and litigation claims that were transferred to the Liquidating Plan Trust, and to distribute those proceeds to the Reorganized Debtor's unsecured creditors. Also, as in *U.S. Brass*, an outstanding obligation that must be resolved prior to full consummation of the Plan is at the heart

---

[41] *Id*. at 305.

of this dispute—namely liquidation of the stock and distribution of the proceeds to the Debtors'
unsecured creditors. ***The issue that is at the heart of this dispute is whether and under what
conditions the Liquidating Plan Trust can liquidate the common stock, notwithstanding
TXMS's characterization of this matter as a simple lease dispute between SCC, Abri, and it***.
TXMS has made a claim for injunctive relief, requesting that:

> a temporary restraining order, temporary injunction and permanent injunction be
> granted enjoining and restraining Defendants and, as applicable, their collective and
> respective agents, servants, employees, attorneys, *and those persons in active
> concert or participation with any of them, from directly or indirectly engaging in
> any Change of Control transaction in violation of Section 16.1(q) of the Master
> Lease.* Pleading in the alternative, Plaintiff requests that a temporary restraining
> order, temporary injunction and permanent injunction be granted enjoining and
> restraining Defendants and, as applicable, their collective and respective agents,
> servants, employees, attorneys, and those persons in active concert or participation
> with any of them, *from making distributions or any other payments to their equity
> holders from the proceeds of any Change of Control transaction*.[42]

This request goes well beyond whatever rights TXMS may have pursuant to the Master Lease.
SCC operates several other properties, provides ancillary services to those properties, and
presumably has other assets of value. Significantly, what precipitated this action was that TXMS
learned that the Committee (whose counsel became counsel to the Plan Trustee for the Liquidating
Plan Trust on the Effective Date, *i.e.*, the following day)—not Abri or SCC—had been in
discussions to sell the equity in Abri. It is apparent from the language above and the context in
which the action was filed, that TXMS is attempting to restrict the Liquidating Plan Trust's actions
in contravention of this court's Confirmation Order.

     In reality, it appears that the injunctive relief that TXMS is seeking may, in substance, be
a collateral attack on the Confirmation Order and this court's subject-matter jurisdiction. "[F]inal
bankruptcy orders . . . become 'res judicata to the parties and those in privity with them, not only

---

[42] Pl.'s Compl., p. 11 (emphasis added).

as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'"[43] "[W]hen parties to a bankruptcy case have been given 'a fair chance to challenge [a] [b]ankruptcy [c]ourt's subject-matter jurisdiction' or a provision of a plan approved by the bankruptcy court during the case and fail to do so, they cannot challenge the court's order later through a collateral attack."[44] This appears to be precisely what TXMS is attempting to do in its request for injunctive relief. Assuming, *arguendo*, TXMS has the power to terminate the Master Lease under state law if there is a change of control, it cannot prevent the Liquidating Plan Trust from liquidating the stock. This court entered the Confirmation Order approving the Plan, which established the Liquidating Plan Trust to take possession of the stock issued pursuant to that Plan, to sell that stock, and distribute the proceeds to the Liquidating Plan Trust's beneficiaries. TXMS had a fair chance to challenge the relevant portion of the Plan that authorized the Liquidating Plan Trust to sell the stock and distribute the proceeds but failed to do so. TXMS cannot now collaterally attack the Confirmation Order, which approved the Plan and Plan-related documents, by seeking *de novo* review by a Texas state district court.

Even if TXMS had limited its causes of action to the declaratory judgment, the court would nevertheless have bankruptcy subject-matter jurisdiction over the Adversary Proceeding. Similar to *U.S. Brass*, TXMS is taking the position that precluding the Liquidating Plan Trust, Abri, or SCC from entering into a transaction that would effect a change in control is consistent with the Plan. The Defendants, on the other hand, contend that, among other things, TXMS is attempting to effectuate a post-confirmation modification of the Plan. In the words of the *U.S. Brass* court,

---

[43] *Oklahoma State Treasurer v. Linn Operating, Incorporated (In re Linn Energy, L.L.C.)*, 927 F.3d 862, 867 (5th Cir. 2019) (quoting *Travelers*, 557 U.S. at 152).

[44] *Id.*

"[b]ankruptcy law will ultimately determine this dispute [i.e., in that the court will have to look to the Plan, Plan Supplement, Confirmation Order, and perhaps other orders entered during the bankruptcy case], and the outcome could affect the parties' post-confirmation rights and responsibilities. Furthermore, this proceeding will certainly impact compliance with, or completion of, the reorganization plan. Consequently, [the Adversary Proceeding] pertains to the plan's implementation or execution and therefore satisfies the *Craig's Stores* test for post-confirmation jurisdiction."[45]

## B.     The Well-Pleaded Complaint Doctrine

There is one potential wrinkle in this Adversary Proceeding that was not present in *U.S. Brass*: this Adversary Proceeding was initially filed in the Texas state district court and removed by the Reorganized Debtor and Abri to this court. TXMS takes the position that its claims rely exclusively on state law and, thus, pursuant to the well-pleaded complaint rule, this court lacks jurisdiction over this matter. "The well-pleaded complaint rule requires that a federal question appear on the face of a well-pleaded complaint in order for federal question jurisdiction to lie in an action."[46] "However, the Supreme Court has specifically held that the well-pleaded complaint doctrine only applies with regard to federal question 'arising under' jurisdiction."[47] The well-pleaded complaint rule is rarely applicable in the bankruptcy removal context because bankruptcy jurisdiction under 28 U.S.C. § 1334 extends farther than 28 U.S.C. § 1331. While 28 U.S.C. § 1331 jurisdiction provides federal question jurisdiction over "arising under" matters, jurisdiction under 28 U.S.C. § 1334(b) extends to matters "arising under" the Bankruptcy Code or "arising in" or "related to" a bankruptcy case. As the court will explain below, this matter "arises in" a still-

---

[45] *U.S. Brass*, 301 F.3d at 305.

[46] *Brooks Mays Music Co.*, 363 B.R. at 814.

[47] *Id*.

pending bankruptcy case. Since this court's subject-matter jurisdiction is not based on "arising under" jurisdiction, the doctrine has no applicability here.[48, 49]

Where the well-pleaded complaint rule is inapplicable, the court may consider unfiled claims of a defendant, provided that they are not immaterial, made solely for the purpose of obtaining jurisdiction, or wholly insubstantial and frivolous, to determine whether a bankruptcy court has jurisdiction over a removed action.[50] Here, the Liquidating Plan Trust has made clear that it will be filing a declaratory judgment action that the contemplated sale of the equity in Abri is permitted under the Plan and that TXMS's attempt to enjoin the sale is an inappropriate, post-confirmation modification of the Plan. The Liquidating Plan Trust's claims are not immaterial, made solely for the purpose of obtaining jurisdiction, or wholly insubstantial and frivolous. Instead, they are sufficient to give this court subject-matter jurisdiction over this matter.

## C.     Abstention/Equitable Remand is Not Appropriate in This Case

TXMS takes the position that, even if this court has jurisdiction over this matter, the court must abstain from adjudicating it and remand the proceeding to the Texas state district court for adjudication. The court disagrees. Section 1334(c)(2) of the United States Code provides that:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is

---

[48] *See Collins v. Sidharthan (In re KSRP, Limited)*, 809 F.3d 263, 268, n. 3 (5th Cir. 2015) ("the well-pleaded complaint rule does not apply in determining whether a bankruptcy court has "related to" jurisdiction over a removed case"). This logic would equally apply to matters that "arise in" a bankruptcy case as "arising in" jurisdiction is also distinct from "arising under" jurisdiction.

[49] Even if the well-pleaded complaint rule applied, its corollary, the artful pleading doctrine would apply. That doctrine provides that "a plaintiff may not defeat removal by omitting to plead necessary federal questions." *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475 (1998). If a plaintiff "artfully pleads" a claim in this fashion, a court may uphold removal even though no federal question appears on the face of the complaint. *Id*.

[50] *KSRP*, 809 F.3d at 267-68.

commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.[51]

"The Fifth Circuit has articulated that mandatory abstention applies where (1) the claim has no independent basis for federal jurisdiction, other than § 1334(b); (2) the claim is a non-core proceeding, *i.e.*, it is related to a case under title 11; (3) an action has been commenced in state court; and (4) the action could be adjudicated timely in state court."[52] TXMS suggests that this court should look to *In re TXNB Internal Case* for guidance as to whether mandatory abstention is required.[53] The court agrees. In that case, the Fifth Circuit held that mandatory abstention *did not apply* because the claim being made by a non-debtor against the debtors was core.[54]

In *U.S. Brass*, the Fifth Circuit explained that "§ 157 equates core proceedings with the categories of 'arising under' and 'arising in' proceedings; therefore, a proceeding is core under section 157 if it invokes a substantive right provided by title 11 [, it 'arises under' the Bankruptcy Code,] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case [, it 'arises in' a bankruptcy case]."[55] As the Fifth Circuit noted in *U.S. Brass*, some courts incorrectly determine that a proceeding arises under the Bankruptcy Code because relief is being requested pursuant to a certain section of the Bankruptcy Code.[56] However, proceedings arise under the Bankruptcy Code when the section itself confers substantive rights to

---

[51] 28 U.S.C. § 1334(c)(2).

[52] *Cedar Park Healthcare, LLC v. Harden Healthcare, LLC (In re Senior Care Centers, LLC)*, 611 B.R. 791, 800 (Bankr. N.D. Tex. 2019).

[53] *Edge Petroleum Operating Company, Inc. v. GPR Holdings, L.L.C. (In re TXNB Internal Case)*, 483 F.3d 292 (5th Cir. 2007).

[54] *Id*. at 300-301; *see also, Galaz*, 841 F.3d at 324 ("Here, the bankruptcy court did not abuse its discretion in refusing to abstain because . . . the proceeding at issue is 'core' under § 157(b).") (internal citations and quotations omitted).

[55] *U.S. Brass*, 301 F.3d at 304 (internal quotations omitted).

[56] *Id*. at 305-306.

the party who is making the claim.[57] The court then found that "§ 1142(b) does not confer substantive rights so much as it empowers the bankruptcy court to enforce the unperformed terms of a confirmed plan."[58]

Here, there is no Bankruptcy Code section that confers substantive rights to either TXMS or the Defendants. Yet, TXMS's claims—when distilled to their essence—especially its claim for injunctive relief, could only arise in the context of a bankruptcy case. Specifically, TXMS seeks to enjoin/place restrictions on how (a) a reorganized debtor, (b) an entity formed pursuant to the Plan to be the parent of the reorganized debtor, and (c) the Liquidating Plan Trust can liquidate stock pursuant to the Plan. Any action to enjoin the Liquidating Plan Trust from liquidating the stock would be preempted by this court's Confirmation Order and TXMS would need to come back to this court to seek modification or clarification of that order. Further, as stated above, the court may consider unfiled claims (provided that they are not immaterial, made solely for the purpose of obtaining jurisdiction, or wholly insubstantial and frivolous) to determine whether it has subject-matter jurisdiction over this proceeding. It logically follows that the court can consider whether those unfiled claims are core or non-core. The Liquidating Plan Trust and SCC have indicated that they will be seeking a declaration of their rights under the Plan and a determination of whether TXMS is attempting to modify the terms of a confirmed plan. Based upon their responses to this court's question regarding whether any sale of the equity will require bankruptcy court approval, it is also clear that they will be seeking relief under section 1142(b), which the Fifth Circuit has suggested in *U.S. Brass* implicates "arising in" bankruptcy jurisdiction and is, therefore, "core." Moreover, even claims that are based on state law defenses may be considered

---

[57] *Id*.

[58] *Id*.

core it they are dependent upon rights created in bankruptcy.[59] The court does not believe it is stretching in assuming that most (if not all) of the Plan Trustee's defenses will be dependent upon rights created in bankruptcy.

Permissive abstention or equitable remand, on the other hand, may apply even where the matter before a court is core. Courts have enumerated 14 factors to consider in determining whether to abstain or equitably remand a removed action:

> (1) the effect or lack thereof on the efficient administration of the estate if the court decides to remand or abstain;
> (2) the extent to which state law issues predominate over bankruptcy issues;
> (3) the difficult or unsettled nature of applicable law;
> (4) the presence of a related proceeding commenced in state court or other nonbankruptcy proceeding;
> (5) the jurisdictional basis, if any, other than § 1334;
> (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;
> (7) the substance rather than the form of an asserted core proceeding;
> (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;
> (9) the burden on the court's docket;
> (10) the likelihood that the commencement of the proceeding in the bankruptcy court involves forum shopping by one of the parties;
> (11) the existence of a right to a jury trial;
> (12) the presence in the proceeding of non-debtor parties;
> (13) comity; and
> (14) the possibility of prejudice to other parties in the action.

While, as pleaded, some of these factors may weigh in favor of permissive abstention and remand, the court must look to the substance rather than the form of TXMS's Complaint. In doing so, it is readily apparent that the factors weigh heavily against permissive abstention and remand. The crux of this matter is whether and under what circumstances the Liquidating Plan Trust formed by SCC's plan of reorganization may liquidate stock in the reorganized company. Making this

---

[59] *Galaz*, 841 F.3d at 323.

determination requires interpretation of complex aspects of bankruptcy law, including the effect of section 365 lease assumption, plan and plan support document interpretation, plan implementation and consummation, and interpretation of this court's prior orders. In short, bankruptcy issues do not merely predominate over state law issues in this case, they overwhelm.

Finally, the court notes that it has some concerns regarding TXMS's position that nothing in the Plan affected its rights under the Master Lease when, during the bankruptcy case, it did not object to the very change of control contemplated in the Plan that it now argues violates its Master Lease. On the other hand, neither SCC, nor the Committee addressed the change of control provision in the Master Lease directly in connection with confirmation when it was clear that the general unsecured creditors could be left with an asset that would be difficult to liquidate. However, the court is not making a ruling in this opinion regarding whether a sale of the equity in Abri by the Liquidating Plan Trust must comply with the change of control provision contained in the Master Lease. The court is merely ruling that, because this is an "arising in" core matter, implicating some of the more complex aspects of bankruptcy law, it should be this court rather than the Texas state district court who determines the parties' respective rights and responsibilities. Based on the foregoing,

**IT IS ORDERED** that the Motion to Remand is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion to Dismiss is **DENIED AS MOOT**.

**#### END OF MEMORANDUM OPINION AND ORDER####**